**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| EUGENE F. TOWERS, Derivatively on Behalf of The Walt Disney Company, <br>               *Plaintiff-Appellant*, <br><br> v. <br><br> ROBERT A. IGER; ALAN BERGMAN; EDWIN CATMULL; JAMES A. RASULO; THOMAS O. STAGGS; SUSAN E. ARNOLD; JOHN S. CHEN; JACK DORSEY; FRED H. LANGHAMMER; AYLWIN B. LEWIS; MONICA C. LOZANO; ROBERT W. MATSCHULLAT; SHERYL SANDBERG; ORIN C. SMITH; RICHARD W. COOK; THE WALT DISNEY COMPANY, a Delaware corporation, Nominal Defendant, <br>               *Defendants-Appellees*. | No. 17-15770 <br><br> D.C. No. 5:15-cv-04609- BLF <br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted November 14, 2018
San Francisco, California

Filed December 26, 2018

Before: SIDNEY R. THOMAS, Chief Judge, MILAN D. SMITH, JR., Circuit Judge, and ELAINE E. BUCKLO,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

**Shareholder Derivative Action**

The panel affirmed the district court's dismissal of a shareholder derivative suit on behalf of The Walt Disney Company because of plaintiff's failure to satisfy Fed. R. Civ. P. 23.1's demand futility requirement.

Plaintiff alleged that Disney's Board of Directors and several corporate officers participated in a conspiracy to enact illegal anticompetitive agreements between Disney and other animation studios. Plaintiff, admittedly, did not make a demand on the Board, and therefore, needed to plead the reasons why such demand would have been futile.

The panel held that plaintiff's amended complaint did not constitute particularized facts demonstrating demand futility. The panel further held that whether the Disney

---

[*] The Honorable Elaine E. Bucklo, United States District Judge for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Board's alleged misconduct was characterized as conscious inaction, or active connivance, plaintiff needed to demonstrate that a majority of the Director defendants knew of the conspiracy – and plaintiff failed to do so.

## COUNSEL

Steven M. McKany (argued), Gina Stassi, Kevin A. Seely, and Brian J. Robbins, Robbins Arroyo LLP, San Diego, California, for Plaintiff-Appellant.

Allen J. Ruby (argued), Richard S. Horvath Jr., and Jack P. DiCanio, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, California; Cliff C. Gardner, Skadden Arps Slate Meagher & Flom LLP, Wilmington, Delaware; for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellant Eugene F. Towers (Plaintiff) brought a shareholder derivative action on behalf of The Walt Disney Company (Disney), alleging that its board of directors and several corporate officers participated in a conspiracy to enact illegal anticompetitive agreements between Disney and other animation studios. The district court dismissed the suit, concluding that the action could not be maintained because Plaintiff failed to satisfy Federal Rule of Civil Procedure 23.1's demand requirement. We affirm.

| 4 | TOWERS v. IGER |
|---|---|

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

Plaintiff is a stockholder of Disney, a Delaware corporation headquartered in Burbank, California. Plaintiff's amended complaint alleged that Disney and other leading animation studios and special effects firms engaged in a long-running, illicit conspiracy to suppress the compensation of skilled technicians.

### A. The Alleged Conspiracy

The conspiracy allegedly began in the mid-1980s, when George Lucas, then-head of alleged co-conspirator Lucasfilm Ltd., LLC (Lucasfilm), sold his company's computer division to Steve Jobs, former CEO of Apple Computer, Inc. (Apple).[1]  Jobs named the new company "Pixar."  At that time, Pixar and Lucasfilm agreed to refrain from recruiting each other's employees.  In subsequent years, Pixar's president, Defendant-Appellee Edwin Catmull, and others allegedly expanded the conspiracy to include Disney, its subsidiary Walt Disney Animation Studios (Disney Animation Studios), DreamWorks Animation SKG, Inc. (DreamWorks), Two Pic MC LLC (formerly known as ImageMovers Digital LLC) (ImageMovers), Sony Pictures Animation, Inc., Sony Pictures Imageworks, Inc., and Blue Sky Studios, Inc.

According to Plaintiff's amended complaint, the conspiracy primarily involved the establishment and enforcement of "gentlemen's agreements" to "artificially

---

[1] Although Plaintiff referred to Jobs's former employer as "Apple Inc." in the amended complaint, Apple did not adopt this abridged name until 2007.  *See Drop the Computer*, The Economist (Jan. 11, 2007), http://www.economist.com/business/2007/01/11/drop-the-computer.

restrict competition for labor and thus illegally restrain trade and deflate compensation for employees . . . . The [] Agreements consisted primarily of agreeing to stop the practice of cold calling into other companies, in exchange for the same." Plaintiff explained that "[c]old calling, where employers call employees working for another company seeking to recruit or 'poach' them, is a vital tool for acquiring skilled labor, particularly in competitive fields." Entering into agreements to prohibit cold calling allowed the conspirators to "keep costs down and prevent bidding wars."

## B. Disney's Role

As of the date of the filing of Plaintiff's amended complaint, Defendants-Appellees Robert A. Iger, Susan E. Arnold, John S. Chen, Jack Dorsey, Fred H. Langhammer, Aylwin B. Lewis, Robert W. Matschullat, Sheryl Sandberg, and Orin C. Smith (together with Defendant-Appellee Monica C. Lozano,[2] the Director Defendants) served on Disney's board of directors (the Board). According to the complaint, the remaining individual Defendants-Appellees were current or former officers of Disney or its subsidiaries and divisions: Catmull was president of Disney Animation Studios, Alan Bergman was president of The Walt Disney Studios (Disney Studios), James A. Rasulo was an advisor to Disney's CEO and was formerly senior vice president and CFO, Thomas O. Staggs was formerly COO and an advisor to the CEO, and Richard W. Cook was formerly chairman of Disney Studios (collectively, the Officer Defendants, and together with the Director Defendants, Defendants). In addition to serving on the Board, Iger was also Disney's

---

[2] Lozano served on the Disney board from 2000 to 2016, but left prior to the filing of Plaintiff's amended complaint.

chairman and CEO, and previously served as its president and COO.

Plaintiff alleged that Disney participated in the conspiracy since at least 2005, as evidenced by an internal Pixar email confirming that Pixar would not recruit workers from Disney. The email noted that "[t]his agreement is mutual." In 2006, Disney purchased Pixar and appointed Catmull—the purported architect of the conspiracy—to run Disney Animation Studios. As part of the purchase negotiations, Disney allegedly agreed to abide by the conspiracy, with the then-chairman of Disney Studios, Cook, explicitly endorsing the scheme in an email exchange with Catmull.

### C.  The DOJ Investigation and Subsequent Litigation

Beginning in 2009, the Department of Justice (DOJ) conducted an investigation of hiring practices in the high-tech sector (the DOJ Investigation). On September 24, 2010, the DOJ filed a complaint against Pixar (by then a wholly owned subsidiary of Disney), Apple, Adobe Systems Inc., Google Inc., Intel Corp., and Intuit Inc.; three months later, it filed a similar suit against Lucasfilm. In these actions, the DOJ alleged that the companies employed anti-poaching agreements that were per se unlawful restraints of trade under antitrust laws. The companies settled with the DOJ in 2010, and final consent judgments were disclosed when the actions were publicized. These consent judgments enjoined the companies from entering into agreements to "refrain from . . . soliciting, cold calling, recruiting, or otherwise competing for employees." However, the consent judgments permitted such agreements in limited circumstances (such as when needed for a merger or acquisition, or for joint projects), and the DOJ imposed no fines or financial penalties against the co-conspirators.

Subsequently, some employees of the conspiring companies filed class action suits against them, and those actions were consolidated in September 2011 under the name *In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509-LHK (N.D. Cal.). Initially, both the DOJ Investigation and *In re High-Tech* implicated only Disney subsidiaries[3] and not Disney itself. However, according to Plaintiff, "[t]hat began to change in May 2013, when certain court documents were made public in the DOJ Investigation," and again in March 2014, with the disclosure of additional documents from *In re High-Tech* that "contain[ed] evidence of a conspiracy involving numerous additional companies, including Disney."

## II. Procedural Background

### A. Initial Proceedings

In 2015, having been "alerted [] to the fact that Disney itself faced serious and substantial harm in light of the anti-competitive practices," Plaintiff first made an inspection demand to Disney and, after negotiating with the company, received and reviewed books and records related to the alleged conspiracy. He then filed his original complaint on September 29, 2015, asserting claims for breach of fiduciary duty and unjust enrichment.

On December 21, 2015, Defendants moved to dismiss Plaintiff's complaint under Rule 23.1 (for failure to plead demand futility) and Rule 12(b)(6) (for failure to state a claim). The district court granted the motion, concluding that Plaintiff "failed to plead sufficient facts regarding the Board's knowledge of the purported conspiracy." The

---

[3] In addition to Pixar, Lucasfilm, which Disney acquired in 2012.

8 TOWERS V. IGER

district court granted leave to amend, emphasizing that, to satisfy Rule 23.1, Plaintiff would need to plead specific facts connecting the Director Defendants to the conspiracy.

Following the dismissal, Plaintiff made a second demand on Disney, secured and reviewed additional documents, and filed an amended complaint on October 21, 2016.

### B. The District Court's Decision

On March 10, 2017, the district court dismissed Plaintiff's amended complaint. The court again concluded that Plaintiff had only alleged,

> at most, that a few high-level employees and officers knew of and participated in the alleged conspiracy. Taken as a whole, these allegations are not sufficient to satisfy Delaware law with respect to demand futility, as they do not show that at least six members of the current board face a substantial likelihood of personal liability for violating their fiduciary duties.

The court noted that Plaintiff's new allegations were drawn from the minutes of meetings that occurred in late 2005 and early 2006, during the time the Board considered and approved the Pixar acquisition. The court determined that these minutes were "rather unremarkable"; the Board discussed various facets of the acquisition, such as personnel issues and strategic aims, but "it would have been remarkable if the Board had not discussed these topics before deciding to acquire Pixar . . . . The only inference that Plaintiff's allegations plausibly support is that the Board discussed entirely appropriate and lawful means to retain and attract creative talent in relation to an acquisition." The

Case: 15-17209, 02/26/18, Document 39-1, Page 8 of 19

court declined to infer that alleged co-conspirators shared details of the scheme with the Board when all were present at these meetings, or that any discussions relating to employment issues implicated the conspiracy.

Consequently, the district court dismissed Plaintiff's amended complaint without leave to amend. This appeal followed.

## STANDARD OF REVIEW AND JURISDICTION

"[W]e review for abuse of discretion the district court's ruling dismissing this shareholder derivative suit on the ground of failure to show demand futility." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1147 (9th Cir. 2014). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## ANALYSIS

### A. Rule 23.1

Rule 23.1 "applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). The rule imposes several pleading requirements, including that a complaint "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and [] the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). This "demand requirement implements 'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders.'"

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984)); *see also Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del. 1984) ("By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement . . . exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." (footnote omitted)).[4] Consequently, "the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

In his amended complaint, Plaintiff admitted that he did not make a demand on the Board. Therefore, he must "plead with particularity the reasons why such demand would have been futile." *Rosenbloom*, 765 F.3d at 1148 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999)). We have emphasized that demand futility "must be decided by the trial court on a case-by-case basis and not by any rote and inelastic criteria." *Id.* (quoting *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010)). Plaintiff is "entitled to all reasonable

---

[4] "Although Rule 23.1 supplies the pleading standard for assessing allegations of demand futility, '[t]he substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief.'" *Rosenbloom*, 765 F.3d at 1148 (alteration in original) (quoting *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004)). Because Disney is incorporated in Delaware, Delaware law controls our demand futility analysis.

factual inferences that logically flow from the particularized facts alleged," *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000), and "[t]he requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations." *In re China Agritech, Inc. S'holder Derivative Litig.*, No. 7163-VCL, 2013 WL 2181514, at *14 (Del. Ch. May 21, 2013).

Although a "smoking gun of Board knowledge" is not required—Plaintiff can instead "alleg[e] particular facts that support an *inference* of conscious inaction"—demand must be assessed on a director-by-director basis such that, "looking to the whole board of directors," demand is excused as to a majority of members. *Rosenbloom*, 765 F.3d at 1151 n.13, 1156; *see also Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) ("Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes. Rather, a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." (footnote omitted)). Because Disney's articles of incorporation exculpated the Board's members from personal monetary liability, Plaintiff must plead bad faith "by alleging with particularity that a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009). Although

> "[t]he good faith business decisions of informed, disinterested, and independent directors of Delaware corporations are entitled to deference under the business judgment standard of review," . . . . "[i]n rare

> cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment." These rare cases include those in which a board decides to undertake illegal activity.

*Rosenbloom*, 765 F.3d at 1149 (citation omitted) (first quoting *Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, No. 6547-VCN, 2014 WL 1813340, at *15 (Del. Ch. May 7, 2014); and then quoting *Aronson*, 473 A.2d at 815).[5]

### B. Plaintiff's Amended Complaint

Plaintiff contends that

> [a] collective analysis of the allegations in the Amended Complaint, viewed in the light most favorable to Plaintiff, and with all reasonable inferences drawn in his favor, establish at least a reasonable inference that a majority of the Board at the time the complaint was filed were aware of the Illegal Anticompetitive Agreements, if not also actively participating in them.

He points to three general allegations to support this inference: that key Disney officers were actively involved in the conspiracy; that "a majority of the Board was serving

---

[5] *Rosenbloom* notes that demand futility based on a board's *active* decisions is subject to a somewhat different analysis than demand futility based on a board's conscious *inaction*. 765 F.3d at 1149–51. However, it ultimately does not matter which theory is applied to Plaintiff's claims here because either would require the Board's knowledge of the conspiracy, which, we conclude, cannot be inferred from the allegations in the amended complaint.

while defendant Cook, the head of Disney studios, was actively orchestrating" the conspiracy; and that "several key architects" of the conspiracy "discussed the Pixar acquisition with a majority of the Board." We consider each allegation in turn.

### i. Involvement of Key Disney Officers

The amended complaint alleged that certain high-ranking Disney officers knew of the conspiracy and discussed its implications. For example, the complaint included an email exchange between Catmull and Cook, in which the former mentioned that "[w]e have avoided wars up in Norther[n] California because all of the companies up here—P[i]xar, ILM, Dreamworks, and [a] couple of smaller places—have conscientiously avoided raiding each other. . . . I would like the kind of relationship that Pixar has with Disney in that people cannot be considered to move back and forth." Cook responded, "I agree. We will reaffirm our position again. As for Pixar or Disney, they absolutely know they are off limits." In another email exchange between Catmull, Bergman, and a senior Disney human resources officer, Catmull reported that a rival recruiter "approach[ed] some of our people" and that "[w]e called to complain and the recruiter immediately stopped," noting that "[t]his kind of relationship has help[ed] keep the peace in the Bay Area and it is important that we continue [to] use restraint." The email ended with an exhortation: "can we have [ImageMovers] do their hunting somewhere else other than our back yard?"

However, even if *non-Board* corporate officers might have discussed or even guided the conspiracy, that by itself is not sufficient to implicate the Director Defendants. To begin, "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal

controls must have been deficient, and the board must have known so." *Desimone*, 924 A.2d at 940; *see also Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 373 (Del. 2006) (declining to "equate a bad outcome with bad faith" because "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws"). Furthermore, "Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes." *Desimone*, 924 A.2d at 943. Thus, we cannot assume that members of the Board had knowledge of the conspiracy simply because other individuals at Disney—even other Board members—knew. Instead, Plaintiff would need to demonstrate a clear line of communication and knowledge between the implicated officers and the Board. *See, e.g.*, *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014) ("Plaintiff may establish director knowledge . . . by establishing that certain [] officers were in a 'reporting relationship' to [] directors, that those officers did in fact report to specific directors, and that those officers received key information."). Here, Plaintiff *did* allege that Cook and Catmull communicated with the Board, particularly during discussions of the Pixar acquisition, but he did *not* allege with particularity that information regarding the conspiracy was ever transmitted to the Board by these or other officers.

In short, the district court did not abuse its discretion when it determined that it could not impute knowledge to the Director Defendants solely because some of the Officer Defendants engaged in the conspiracy and discussed it amongst themselves.

### ii. Cook and the Board

Plaintiff notes that "seven of the Company's eleven directors (at the time of filing) have served on the Board since 2006, 'when the Company's participation in the conspiracy was in full effect.'" He argues that "it is a reasonable inference that defendant Cook, who was freely discussing [the conspiracy] with the heads of other companies, including and especially defendant Catmull, was also sharing that information with the members of Disney's Board." The main support for this inference, in addition to Cook's emails with Catmull, is language from Disney's 2015 Form 10-K, in which it discussed, in Plaintiff's words, "the significant adverse effects that employment costs can have on the Company and the [] Defendants' 'active' efforts to 'control increases' in those costs."

Under Delaware law, we cannot infer that Cook shared his knowledge with other members of the Board simply because he discussed the conspiracy with Catmull. Plaintiff claims that the 10-K provides a link between the Board and Cook's misconduct, but while that document's allegedly incriminating language did discuss employment costs, it was not in the context of competitors' pilfering of Disney employees or the Board's efforts to prevent it. Instead, the 10-K focused on the "costs of pension benefits and current and postretirement medical benefits," as well as "[l]abor disputes" stemming from "collective bargaining agreements." Accordingly, Plaintiff cannot tie this 10-K to the alleged conspiracy such that we can infer Board knowledge.

### iii. Board Meeting Discussions of Pixar's Acquisition

Lastly, Plaintiff's amended complaint relied heavily on the minutes of meetings that the Board conducted around the time of the Pixar acquisition, during which the directors discussed various issues relating to the merger. Plaintiff alleged that the Board addressed employment issues and the overall competition for talent, and that Jobs, allegedly a primary player in the conspiracy, spoke to the Board regarding the acquisition. However, discussion of these employment-related topics does not permit us to infer that the Board knew of the conspiracy. Just as Delaware law prevents us from imputing knowledge or bad faith to the Board simply because other officers knew of and engaged in misconduct, it also suggests that knowledge of misconduct cannot be imputed to the Director Defendants simply because the Board oversaw an acquisition that touched on related issues. *See Ash v. McCall*, No. Civ.A. 17132, 2000 WL 1370341, at *8–9 (Del. Ch. Sept. 15, 2000) (determining that "[t]he notion that [directors overseeing a merger] had actual knowledge of" red flags could not be maintained where allegations did not plead this knowledge and "plaintiffs' claims sound[ed] in negligence, at most").

Plaintiff argues that the district court improperly drew inferences against him as to the board meeting allegations, but this is not accurate. The amended complaint does not contain specific allegations that can be inferred *in favor* of Plaintiff, because we cannot establish an inference of Board knowledge merely through proximity to the conspiracy or the alleged misconduct of Disney officers. As the Delaware Court of Chancery has explained,

> Plaintiffs' invitation to play inferential hopscotch does not comport with Rule 23.1's

> "stringent requirements of factual particularity." While the Court must "draw all *reasonable* inferences in the plaintiff's favor," our Supreme Court has made clear that "conclusory allegations are not considered as expressly pleaded facts or factual inferences." Even reasonable inferences "must logically flow from particularized facts alleged by the plaintiff."

*Horman v. Abney*, No. 12290-VCS, 2017 WL 242571, at *12 (Del. Ch. Jan. 19, 2017) (footnotes omitted) (first quoting *Brehm*, 746 A.2d at 254; and then quoting *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008)).

Accordingly, the district court did not abuse its discretion when it declined to infer knowledge of the conspiracy based on the fact that the Board discussed employment issues at these meetings. As the court noted, "The only inference that Plaintiff's allegations plausibly support is that the Board discussed entirely appropriate and lawful means to retain and attract creative talent in relation to an acquisition." The district court concluded that "Plaintiff alleges no particularized facts demonstrating that Jobs or anyone else revealed any recruiting practices, let alone any unlawful conspiracy, to the members of the Board." This conclusion is reasonable and entirely consistent with both the allegations in the amended complaint and controlling law.

\*     \*     \*

Ultimately, the allegations in Plaintiff's amended complaint do not constitute particularized facts demonstrating demand futility. Whether the Board's alleged misconduct is characterized as conscious inaction or active

18 Towers v. Iger

connivance, Plaintiff needed to demonstrate that a majority of the Director Defendants knew of the conspiracy, and he failed to do so.

Plaintiff is correct that he does not need to show evidence of a smoking gun, and relies on *Rosenbloom* to this effect. However, in that case, the plaintiffs "offer[ed] a battery of particularized factual allegations that strongly support[ed] an inference . . . that the Board knew of and did nothing about illegal activity." *Rosenbloom*, 765 F.3d at 1152. Such allegations included that the board "closely and regularly monitored" potentially illicit activities; "received data" that "qualifie[d] as a 'red flag'" of illegality; and "received repeated FDA warnings about illegal" activities. *Id.* at 1152–54. Here, by contrast, it is not even clear that the Board was *aware* of a conspiracy, let alone either consciously disregarded or actively encouraged it such that the Director Defendants acted in bad faith.[6] A smoking gun may not be needed, but something more than speculative, conclusory allegations is required. All Plaintiff alleged is that the Board was in close proximity to officers who were

---

[6] Consequently, this case is more similar to those in which courts distinguished their operative allegations from those in *Rosenbloom*. *See, e.g.*, *In re First Solar Derivative Litig.*, No. CV-12-00769-PHX-DGC, 2016 WL 3548758, at *13 (D. Ariz. June 30, 2016) (determining that "[t]his case differs from *Rosenbloom*" because "Plaintiffs have not alleged that there was enduring and pervasive misconduct" and "Plaintiffs have not alleged that the board was informed of the critical facts *by anyone*"); *In re Impax Labs., Inc. S'holder Derivative Litig.*, No. 14-cv-04266-HSG, 2015 WL 5168777, at *6 (N.D. Cal. Sept. 3, 2015) (noting that *Rosenbloom* "address[ed] circumstances far more extreme than those presented here," where "there are no particularized allegations that the Impax Board affirmatively adopted plans to perpetuate any illegal conduct or made a conscious decision not to take any action in response to" red flags of illegality).

involved with the conspiracy, and that its members discussed related issues at meetings. These allegations would likely be insufficient even under de novo review; consequently, under the more deferential standard that we must apply, the district court did not abuse its discretion when it concluded that Plaintiff failed to plead demand futility.[7]

## CONCLUSION

Plaintiff failed to plead particularized facts relating to demand futility, as required by Rule 23.1. Accordingly, we AFFIRM the district court's order granting Defendants' motion to dismiss.

---

[7] The district court also concluded that Plaintiff's claims were time-barred by the applicable three-year statute of limitations. However, because Plaintiff's failure to plead demand futility constitutes a sufficient basis for dismissal, we need not consider whether the district court correctly calculated the statute of limitations.